# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51049-9-II |
| Respondent, | |
| v. | |
| JOHN GREYSTOKE, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — John Greystoke appeals his conviction and sentence for first degree assault with a deadly weapon sentencing enhancement. He argues that the trial court (1) violated his constitutional right to present a defense when it prohibited him from raising a diminished capacity defense at trial, (2) abused its discretion when it permitted him to waive his right to counsel, and (3) commented on the evidence on three occasions. He further argues that (4) he was entitled to have the jury instructed on the inferior degree offense of second degree assault, (5) his deadly weapons sentencing enhancement must be reversed because it was not charged in the information, and (6) his legal financial obligations (LFOs) must be reversed because his income consists entirely of social security disability benefits.

We reverse Greystoke's conviction because he was entitled to an inferior degree instruction on second degree assault. Accordingly, we do not reach his constitutional claims of error.

FACTS

I. BACKGROUND FACTS

Greystoke has a long history of mental illness. Prior to the incident leading to his trial and conviction, he had been diagnosed with schizoaffective disorder and a psychotic disorder. These illnesses have caused him to suffer from auditory hallucinations and impulsive behavior. His sole source of income for many years was his social security and disability benefits.

Greystoke had been living in the same apartment for 10 to 15 years without incident. Sometime in April 2016, Greystoke permitted Adam Gross to stay in his apartment for several nights because Gross was getting evicted from his own residence. Shortly after Gross moved in with Greystoke, Gross's girlfriend, Michelle Kiehl, moved in as well. Rather than stay a few days, however, Gross and Kiehl stayed for several weeks. After Gross and Kiehl moved in, Greystoke's landlord threatened to evict Greystoke. In an e-mail to Greystoke's mother, Gross explained that he overheard Greystoke's landlord telling Greystoke that he was evicting Greystoke because Gross and Kiehl moved in. Gross promised that he would move out, but he did not. The night prior to the incident, Greystoke told Gross to "get out in very strong language," but Gross refused. 4 Verbatim Report of Proceedings (VRP) at 665.

On April 24, 2016, the morning after Gross sent Greystoke's mother the e-mail, Gross left the apartment early to go to the nearby convenience store. When Gross attempted to enter Greystoke's apartment, Greystoke stabbed Gross in the abdomen. Gross testified that immediately upon realizing what he had done, Greystoke's expression changed from hostility to a look of panic, as though he needed to run.

Greystoke initially ran from the apartment, but immediately told a stranger about the stabbing and waited nearby for police to arrive. He cooperated with police and helped them locate the knife. Greystoke told Officer Jeff Thaxton of the Port Angeles Police Department that he stabbed Gross because Gross had taken advantage of him, was verbally abusive to him, and refused to leave despite being repeatedly asked to do so.

Gross suffered a serious injury that penetrated the abdominal cavity, but he fully recovered. Greystoke was charged with first degree assault by use of a deadly weapon. He was found guilty and sentenced to 117 months imprisonment with an additional 24 months for a deadly weapon enhancement.

## II. PRETRIAL PROCEEDINGS

Greystoke was arraigned on May 6, 2016, and the trial court appointed Loren Oakley as his counsel. Over six months passed while Greystoke waited for Oakley to arrange a mental health evaluation, during which time there appeared to be no movement in his case.

Greystoke made his first of three requests to represent himself at a hearing on November 4, 2016. After expressing concern about Greystoke's competency, the trial court ordered a competency evaluation.

Once the competency evaluation was completed, the trial court revisited Greystoke's request to represent himself at a hearing on December 9. Harry Gasnick attended the hearing on Oakley's behalf. Gasnick remarked that he did not know if the competency evaluation report addressed Greystoke's ability to represent himself as "[t]here may be a little bit of difference between competence to stand trial and ability to represent one self," and he was "not sure if there's

3

a difference on that." 1 VRP at 28. The trial court did not address Gasnick's point and proceeded to engage Greystoke in the beginnings of a *Faretta*[1] colloquy.

When the trial court asked why Greystoke wanted to represent himself, Greystoke answered that it was "[b]ecause I've written to Mr. Oakley and called him on the phone and he hasn't responded and he's only seen me three times in eight months." *Id.* at 29. Gasnick interrupted the colloquy and said that if Greystoke's concern was the lack of responsiveness, he would be willing to meet with Oakley to come up with a plan regarding Greystoke's representation. Thus, the trial court did not make a decision on Greystoke's request. At a hearing the following week, Oakley appeared on Greystoke's behalf and explained that Greystoke did not intend to represent himself and wished to explore mental health defenses.

Several months later, Greystoke made a second request for either a new attorney "or pro-se, whichever," because it took nine months to complete one mental health evaluation and he was concerned that it would take an additional nine months to arrange another. *Id.* at 41. Oakley later informed the trial court that Gasnick was going to take over the case.

Gasnick told the trial court that Greystoke informed him that he wished to pursue a mental health defense and that they have begun to acquire documentation from Peninsula Behavioral Health regarding Greystoke's mental health history. But after Greystoke was evaluated by Dr. Mark McClung, a forensic psychiatrist, for a possible diminished capacity or insanity defense, the State informed the trial court that it received an e-mail from Gasnick stating that he would not pursue an insanity or diminished capacity defense.

---

[1] *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

Gasnick later explained to the trial court that in light of McClung's report, he expected it "would result in a mitigation package only, not an actual affirmative defense of mental health based defense." *Id.* at 82. McClung's report did not make any conclusions regarding Greystoke's ability to form intent during the incident, but it did state that "[d]ue to [Greystoke's] mental disorder, Mr. Greystoke was more likely to react impulsively, dramatically, and aggressively in a highly stressful situation such as he was experiencing at the time of this incident." Clerk's Papers (CP) at 55. Gasnick made no further effort to obtain an expert opinion that presented an explicit conclusion on Greystoke's ability to form the requisite intent.

Less than one week after Gasnick informed the State that he would not pursue a mental health defense on behalf of Greystoke, Gasnick told the trial court that Greystoke told him that he would like different counsel. Greystoke explained that he wanted someone "more knowledgeable about the facts applicable to the charges." 1 VRP at 75. The trial court responded that Gasnick is a very experienced attorney and reminded Greystoke that he had an "objection" to representation by his former attorney. *Id.* Greystoke corrected the court, explaining that he did not have an objection to Oakley, but was concerned that Oakley had personal issues that were hampering the representation. Gasnick had informed the trial court at an earlier hearing that he and Oakley "switched clients." *Id.* at 70. The record on appeal does not contain a substitution of counsel.

The trial court initiated a *Faretta* colloquy with Greystoke, but Greystoke had not specifically requested to represent himself at that point. After asking Greystoke a few questions, the trial court abandoned the self-representation colloquy and said, "[G]iven the fact that we've been down this path before," he did not find there was a total breakdown in communication and would not appoint a new attorney. *Id.* at 79. The trial court ruled that Gasnick would continue

with the representation, remarking that Greystoke had already been provided two attorneys, and he would not be given a third.

Gasnick then reminded the trial court that several months prior to this hearing, when Greystoke first asked to represent himself, the trial court ordered a competency evaluation and Greystoke was deemed competent to stand trial following that report. Gasnick proceeded to note his own concerns regarding Greystoke's competence based on Greystoke's "inability or unwillingness to communicate with [him]." *Id.* at 82.

In addition, Gasnick addressed a motion that Greystoke had written himself. In that motion, Greystoke requested a second opinion by a mental health evaluator of Greystoke's choice who was "more qualified than Dr. Clung [sic]" as well as a replacement for Gasnick or permission to represent himself. CP at 220. In reference to Greystoke's request for a new evaluator, Gasnick told the trial court that he would discuss the matter with Greystoke and that he would file a motion and "[w]hat the court does with that is what the court does with that." 1 VRP at 83. The record on appeal does not contain such a motion. At the following hearing, Gasnick moved for an additional competency evaluation to be done in reference to Greystoke's request to proceed with self-representation, rather than a mental health evaluation that would address any potential mental health-related defenses.

Greystoke was found competent to stand trial following the second evaluation. Greystoke renewed his request to represent himself, and the trial court granted Greystoke's motion following

a brief colloquy. The trial court, after initial resistance from Greystoke, appointed Gasnick as stand-by counsel.[2]

Although the trial court was aware of Greystoke's history of mental illness and that Greystoke had twice been evaluated for competency, the trial court did not review the criteria in RCW 10.77.020(1)[3] when considering Greystoke's request to waive counsel during its colloquy, beyond its description of the nature of the charges as a "pretty serious crime." *Id.* at 93. After once again asking, "[A]nd, you're still willing to proceed without an attorney even assisting you," Greystoke responded that he was, and Greystoke signed the attorney waiver. *Id.* at 97.

The State filed a motion to amend the information on August 30 to include a deadly weapon enhancement. Greystoke attempted to object to the State's motion, but the trial court stated that

---

[2] At the time Greystoke accepted Gasnick as stand-by counsel, the judge informed Greystoke that his decision was irrevocable because "[w]e've gone this pro-se, counsel, pro-se, counsel, a couple of times now," and this was the last time any changes would be permitted. 1 VRP at 151. Neither the prosecutor or Gasnick corrected the record on this point. The judge's belief that Greystoke had been self-represented twice was incorrect. There also had never been a disqualification or formal substitution of counsel. Rather, Oakley and Gasnick had "switched" clients, apparently without involvement from the court. *Id.* at 70.

[3] RCW 10.77.020(1) provides that any person subject to the chapter on criminal insanity is entitled to the assistance of counsel, and

> "[a] person may waive his or her right to counsel; but such waiver shall only be effective if a court makes a specific finding that he or she is or was competent to so waive. In making such findings, the court shall be guided but not limited by the following standards: Whether the person attempting to waive the assistance of counsel, does so understanding:
> > (a) The nature of the charges;
> > (b) The statutory offense included within them;
> > (c) The range of allowable punishments thereunder;
> > (d) Possible defenses to the charges and circumstances in mitigation thereof;
> and
> > (e) All other facts essential to a broad understanding of the whole matter.

7

Greystoke would have to present a written objection and that at any rate, the matter would not be addressed until a hearing on October 3. The matter was not addressed on October 3, and the record on appeal does not reflect that the amended information was ever filed or that the State's motion to amend was granted by the court.

Greystoke provided the State with a list of 14 witnesses at a hearing on September 8, 2017. This list included all the doctors who evaluated Greystoke for both competency and diminished capacity. The State asserted that the list was insufficient and "demand[ed]" that supplemental information "be turned over a week from today," which was September 15. 2 VRP at 260. Specifically, the State wanted a summary of the expected testimony the witnesses would provide, as well as their dates of birth and contact information. The trial court apparently granted the State's request and stated that "time is of the essence in regard to the witness list."[4] *Id.* at 263.

The State filed motions in limine on September 25, 2017 to exclude both lay and expert witnesses from testifying about Greystoke's mental state at the time of the incident because Greystoke did not provide notice to the State of his intent to raise a defense "beyond general denial." CP at 168. The trial court granted these motions at a hearing on October 3, four days before trial, but stated that the rulings could be modified during trial and that it would grant "some flexibility in this." 2 VRP 294. During this exchange, it was apparent that Greystoke was confused regarding the general denial defense and its relationship to what he believed were "mitigating factor[s]" in his defense. *Id.* 293.

---

[4] Our records contain no written court order on the State's request.

### III. TRIAL

On October 9, the first day of trial, the State argued that the trial court had "already ruled regarding any mental health defense," and Greystoke "has not established nor raised a mental health defense." *Id.* at 333-34. On that basis, the State moved to strike all of Greystoke's expert witnesses who would testify regarding his mental health including those who had evaluated Greystoke for competence and for diminished capacity. Greystoke objected, explaining that "[his] defense is an acquittal on the grounds of mental incompatibility." *Id.* at 334. The trial court informed Greystoke that it had reviewed his file and Greystoke had apparently "waive[d]" the defense in July, but it did not note what act in July constituted such "waiver." *Id.* The trial court remarked that Greystoke had not done anything since then that would "resurrect" the defense. *Id.*

After Greystoke addressed the jury during voir dire, individual jury panel members began expressing concerns regarding his demeanor, noting that Greystoke was "not all here." 3 VRP at 511. Another juror expressed that it "almost seems like a travesty of the court system" that Greystoke was permitted to represent himself. *Id.* And a different juror noted, "[T]he concern of a lot of us is not so much quirkiness or mannerisms or lack of experience, as it is it seems like it's totally unbalanced. The man is not gonna get a fair shake here, even though it's his choice." *Id.* at 517. In response to the juror's concerns, the trial court explained that Greystoke's limitations could be compared to a college football team facing off against a professional football team.

After the evidence was presented at trial, Greystoke requested, on the advice of Gasnick, that the jury be instructed on the inferior degree offense of second degree assault. The trial court denied Greystoke's request. During deliberations, the jury requested an instruction on second degree assault, and Greystoke renewed his request, but the trial court again refused to provide it.

The jury convicted Greystoke of first degree assault and returned a special verdict finding that he used a deadly weapon in the commission of the crime. Greystoke was sentenced to 117 months in prison and 24 months for the deadly weapon enhancement. The trial court believed Greystoke should serve his time at Western State Hospital and indicated this belief in the judgment and sentence. Greystoke appeals.

DISCUSSION

Greystoke contends that he was entitled to a second degree assault instruction because substantial evidence in the record, when viewed in the light most favorable to him, supported the giving of that instruction. Greystoke asserts that the trial court denied his request based on its misinterpretation of the evidence regarding the size of Gross's wound immediately after the incident and its determination that giving this instruction would "complicate" matters for the jury, which is the incorrect standard for giving an inferior degree offense instruction. Br. of Appellant at 37 (citing 5 VRP at 833).

During the discussion on the inferior degree offense, the trial court remarked that a second degree instruction was unwarranted "for all the reasons [the State] articulated," and it was additionally significant to the court that Gross's wound went from below his belly button to the central part of his chest. 5 VRP at 807. This assertion, however, was incorrect because the stab wound was only one inch long, but the wound was made larger during surgery.

The State counters that even if the evidence is viewed in the light most favorable to Greystoke and even if the trial court's misinterpretation regarding the size of the wound is disregarded, substantial other evidence related to the severity of the injury shows that Greystoke committed first degree assault.

We hold that because the evidence, when viewed in the light most favorable to Greystoke, affirmatively raised the inference that he was guilty of only second degree assault, the second degree assault instruction should have been given to the jury.

## I. LEGAL PRINCIPLES

Where an individual is charged upon information or indictment of an offense that consists of different degrees, a jury is permitted to find the defendant guilty of an inferior degree of the offense charged. RCW 10.61.003. The party requesting an instruction on an inferior degree offense must show

> "(1) the statutes for both the charged offense and the proposed inferior degree offense proscribe but one offense; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense."

*State v. Fernandez-Medina*, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (internal quotation marks omitted) (quoting *State v. Peterson*, 133 Wn.2d 885, 891, 948 P.2d 381 (1997)).

The legal component of the test is satisfied in the case of first and second degree assault because the statutes for both the charged offense and the proposed inferior degree offense proscribe but one offense, and the charged offense is divided into degrees, with second degree assault being an inferior degree offense of first degree assault. *State v. Foster*, 91 Wn.2d 466, 472, 589 P.2d 789 (1979).

The factual prong is satisfied when "substantial evidence in the record supports a rational inference that the defendant committed only the lesser included or inferior degree offense to the exclusion of the greater offense." *Fernandez-Medina*, 141 Wn.2d at 461. The evidence must be enough to "affirmatively establish the defendant's theory of the case," and the trial court is required

11

to consider all evidence presented at trial when deciding whether to provide the instruction. *Id.* at 456. On review, the evidence is viewed in the light most favorable to the party that requested the instruction. *Id.* at 455-56.

The distinction between first degree assault and second degree assault is a matter of intent. First degree assault requires proof that an individual acted with specific intent to inflict great bodily harm, whereas second degree assault requires proof that the individual acted with intent to commit only the assault. RCW 9A.36.011, .021. Specific intent refers to the intent to "produce a specific result, as opposed to intent to do the physical act that produces the result." *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). Intent is determined on an examination of all circumstances in the case and is not limited to the "'manner and act of inflicting the wound.'" *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994) (internal quotation marks omitted) (quoting *State v. Ferreira*, 69 Wn. App. 465, 468, 850 P.2d 541 (1993)). Therefore, the inferior degree instruction should be given if the evidence "affirmatively establish[es]" that the defendant did not act with the intent to inflict great bodily harm, but with only the intent to commit the assault. *Fernandez-Medina*, 141 Wn.2d at 456.

## II. ANALYSIS

Here, only the factual prong is at issue. Applying the principles set forth above, Greystoke was entitled to the second degree assault instruction. Based on the evidence presented, a jury could rationally find that Greystoke acted with the intent to stab Gross but not with the intent to inflict great bodily harm. *See Fernandez-Medina*, 141 Wn.2d at 456.

Greystoke has a long history of mental illness that caused impulsive behavior, but he had been living in the same apartment for 10 to 15 years without incident. Greystoke's landlord told

Greystoke that he would be evicted because Gross and Kiehl had moved in. Although Gross had promised to move out, he did not. The night prior to the incident, Greystoke told Gross to "get out in very strong language," but Gross refused. 4 VRP at 665.

Gross testified that after the stabbing, upon realizing what he had done, Greystoke's expression changed from hostility to panic. Greystoke initially ran from the apartment after the incident, but immediately told a stranger about the stabbing and waited nearby for police to arrive. He cooperated with police and helped them locate the knife.

Viewed in a light most favorable to Greystoke, this evidence would permit a jury to rationally find that Greystoke likely intended to scare or injure Gross but that he did not intend to inflict harm that created a probability of death.

In addition, it is significant that during deliberations, the jury asked to see the definition of second degree assault. Greystoke did not dispute that he stabbed Gross nor did he deny that Gross's wound was serious. Thus, in asking for the inferior degree assault instruction, the jury was evidently wrestling with whether Greystoke had the requisite intent to commit first degree assault.

Satisfaction of the factual prong of the inferior degree instruction test does not require Greystoke to show that there is *no evidence* of heightened intent, but only that "substantial evidence in the record supports a rational inference that the defendant committed only the . . . inferior degree offense to the exclusion of the greater offense." *Fernandez-Medina*, 141 Wn.2d at

13

461. Evidence regarding the extent of the wound and the fact that it could have been fatal may be some evidence of intent. However, this evidence relates more to the *result* of an act rather than Greystoke's intent.

The State compares this case to *State v. Huddleston*, 80 Wn. App. 916, 922, 912 P.2d 1068 (1996), to suggest that because Greystoke "used a knife to stab" Gross and the wound was "thought to be life-threatening," the evidence shows that Greystoke had specific intent to inflict great bodily injury. Br. of Resp't at 44. However, *Huddleston* does not support the State's argument because there, the defendant claimed that the evidence was insufficient to support his first degree assault conviction and that claim compels construction of the facts through a lens that is deferential to the State. 80 Wn. App. at 922. Although evidence that Greystoke stabbed Gross and caused potentially fatal injuries may have been sufficient to show specific intent in the context of sufficiency of the evidence, the same is not necessarily true where the standard of review requires us to consider the evidence in the light most favorable to the party requesting the instruction. *See Fernandez-Medina*, 141 Wn.2d at 455-56.

Substantial evidence raised the inference that Greystoke committed only second degree assault and not first degree assault. "'[A] defendant in a criminal case is entitled to have the jury fully instructed on the defense theory of the case.'" *Id.* at 461 (quoting *State v. Staley*, 123 Wn.2d

794, 803, 872 P.2d 502 (1994)).  Accordingly, Greystoke was entitled to a second degree assault

instruction.  We reverse.[5]

---

[5] Although we reverse the trial court on this basis, we note several grave concerns with the trial proceedings in this case apart from the failure to provide a second degree assault instruction.

First, we are concerned by the trial court's decision to allow Greystoke to waive his right to counsel on an inadequate colloquy that failed to apprise him of the nature and classification of the charge against him and, given Greystoke's evident mental health issues, on an inadequate colloquy under RCW 10.77.020(1)(c).  The circumstances of this case demanded a further inquiry into Greystoke's understanding of the available defenses and the strict requirements for raising diminished capacity prior to permitting him to waive his right to counsel.  A reasonable reading of the record before us demonstrates that Greystoke alerted the trial court that his request for new counsel or to represent himself was based upon his attorney's decision not to pursue a mental health defense.  In the same motion in which Greystoke asked for new counsel or to represent himself, he also asked to receive a second mental health evaluation by an expert of his choice.  He never received an evaluation that actually rendered an opinion regarding his ability to form the requisite intent, which he was entitled to.  Given the circumstances, at the pretrial hearing on October 3, the trial court should have clarified the requirements regarding asserting the diminished capacity defense rather than merely telling Greystoke that he failed to adhere to statutory notice requirements for raising defenses in general.

Relatedly, we are further unsettled by the fact that the trial court determined that Greystoke "waive[d]" his diminished capacity defense and precluded him from presenting any expert testimony on the subject without any explanation as to what constituted this "waiver."  2 VRP at 334.  On review of the record, we note numerous instances in which Greystoke provided advance notice of his intent to raise a mental health defense to both the State and the court after he terminated Gasnick's representation.

Regardless of whether the trial court determined that Greystoke "waived" the defense because it held him to his former attorney's decision not to pursue it or because of Greystoke's failure to provide formal notice *after* he terminated Gasnick's representation, we are concerned by the trial court's decision to apply a wholesale exclusion remedy in either case.

Finally, we note our serious concern that Greystoke was sentenced to 24 months confinement for a deadly weapon enhancement that was never included in the only information filed in the superior court.  Mere notice of the intent to seek a sentencing enhancement attached to a motion to amend an information that is never granted by the court is insufficient.  Rather, the enhancement must be charged in the information.  *State v. Theroff*, 95 Wn.2d 385, 392, 622 P.2d 1240 (1980) (holding that "[w]hen prosecutors seek enhanced penalties, notice of their intent must be set forth in the information.  Our concern is more than infatuation with mere technical requirements").

No. 51049-9-II

CONCLUSION

We reverse Greystoke's conviction for first degree assault. Greystoke was entitled to an inferior degree instruction for second degree assault because substantial evidence in the record affirmatively established that he committed only the lesser offense.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, J.

LEE, A.C.J.

16